UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

QUIEAUNA WILSON, as Personal
Representative of the Estate of PORTER E.
BURKS, Deceased,

    Case No. 24-
    Hon.

    Plaintiff,

v.

CITY OF DETROIT, a Municipal Corporation,
Police Chief JAMES WHITE, in his official
capacity, and Officers COREY DAVIS #474,
NICHOLAS DEDELUK #S-1271, BEVERLEY
A. JONES #2101, LORENZO PALMER #3984,
ZACHERY SYMANNS #4195, SEAMUS
WADERLOW #4845, TRISTIAN WAGNER
#4188, and MAX J. ZAHRINGER #5134, in
their Individual Capacities, Jointly and Severally,

    Defendants.

___

TODD J. WEGLARZ (P48035)
Fieger Law
Attorneys for Plaintiff
19390 W. 10 Mile Road
Southfield, MI 48075
(248) 355-5555
(248) 355-5148 (fax)
t.weglarz@fiegerlaw.com

## PLAINTIFF'S COMPLAINT AND DEMAND FOR JURY TRIAL

A prior action arising out of the same transaction or occurrence as alleged in this complaint has previously been filed. That action is *Estate of Porter Burks, Dec'd v City of Detroit,* Case No. 22-013008-NO, of the Wayne County Circuit Court, assigned to the Honorable Catherine L. Heise. That action remains pending.

/s/ Todd J. Weglarz (P48035)

NOW COMES Plaintiff, QUIEAUNA WILSON, as Personal Representative of the Estate of PORTER BURKS, Deceased, by and through her attorneys, FIEGER LAW, and for her Complaint and Jury Demand against the above-named Defendants, states as follows:

1.      This is a wrongful death action brought by Plaintiff in her representative capacity against Defendants for money damages pursuant to 42 U.S.C. §§ 1983 and 1988, the Fourth and Fourteenth Amendments to the United States Constitution, and 42 U.S.C. §12101 - the Americans with Disabilities Act of 1990, against Defendants CITY OF DETROIT, City of Detroit Chief of Police JAMES WHITE, in his official capacity, and City of Detroit Police Officers COREY DAVIS #474, BEVERLEY A. JONES #2101, SEAMUS WADERLOW #4845, TRISTIAN WAGNER #4188, and MAX J. ZAHRINGER #5134, in their individual capacities, and state law claims against all Defendants, and state law claims against all Defendants.

2.      This court has jurisdiction over Plaintiff's 42 U.S.C. §§ 1983, 1988 and 12101 claims presented in this Complaint based upon the laws of the United States pursuant to 28 U.S.C. §§ 1331 and 1343.

3.      This court has jurisdiction over Plaintiff's state law claims pursuant to Federal Rule of Civil Procedure 18 and 28 U.S.C. § 1367.

4.      Venue lies in the Eastern District of Michigan pursuant to 28 U.S.C. §1391(b). The unlawful actions alleged in this Complaint took place within the City

of Detroit, in Wayne County, located within the Southern Division of the Eastern District of Michigan.

5.     The amount in controversy exceeds Seventy-Five Thousand ($75,000.00) Dollars, excluding interest, costs and attorney fees.

## **PARTIES**

6.     Plaintiff QUIEAUNA WILSON is the duly appointed Personal Representative of the Estate of PORTER E. BURKS, Deceased (hereinafter "PORTER", "BURKS", and/or "PORTER BURKS"), and at all times relevant to this action is, and was, a resident of the City of Detroit, Wayne County, State of Michigan.

7.     Defendant CITY OF DETROIT ("CITY OF DETROIT") is a Michigan municipal corporation located in Wayne County, Michigan, and is the body responsible for the control and oversight of its departments, agencies, and facilities, including the DETROIT POLICE DEPARTMENT, as well as its sworn officers, including Defendants JAMES WHITE, COREY DAVIS, BEVERLEY A. JONES, SEAMUS WADERLOW, TRISTIAN WAGNER, and MAX J. ZAHRINGER.

8.     Defendant JAMES WHITE ("WHITE") is and at all times relevant to this action was, a resident of the State of Michigan. Defendant WHITE is sued in his official capacity as the Chief of the Detroit Police Department and final policy-

maker, employed by the Defendant CITY OF DETROIT and/or DETROIT POLICE DEPARTMENT ("DPD" or "Department" hereinafter).

9.      Defendant COREY DAVIS #474 ("DAVIS") is and at all times was, a resident of the State of Michigan, employed as a sworn police officer by Defendant CITY OF DETROIT, acting in the course and scope of his employment, who is being sued in his individual capacity.

10.     Defendant NICHOLAS DEDELUK #S-1271 ("DEDELUK") is and at all times was, a resident of the State of Michigan, employed as a sworn police officer by Defendant CITY OF DETROIT, acting in the course and scope of his employment in his capacity as a Shift Commander / Supervisor, who is being sued in his individual and official capacity

11.     Defendant BEVERLEY A. JONES #2101 ("JONES") is and at all times was a resident of the State of Michigan, employed as a sworn police officer by Defendant CITY OF DETROIT, acting in the course and scope of her employment, who is being sued in her individual capacity.

12.     Defendant LORENZO PALMER, DPD Badge #3984 ("PALMER") is and at all times was a resident of the State of Michigan, employed as a sworn police officer by Defendant CITY OF DETROIT, acting in the course and scope of his employment, who is being sued in his individual capacity.

13.     Defendant    ZACHERY    SYMANNS,    DPD    Badge    #4195 ("SYMANNS") is, and at all times was, a resident of the State of Michigan, employed as a sworn police officer by Defendant CITY OF DETROIT, acting in the course and scope of his employment, who is being sued in his individual capacity.

14.     Defendant    SEAMUS    WADERLOW,    DPD    Badge    #4845 ("WADERLOW") is, and at all times was, a resident of the State of Michigan, employed as a sworn police officer by Defendant CITY OF DETROIT, acting in the course and scope of his employment, who is being sued in his individual capacity as a member of the of the Department's "Crisis Intervention Team", who was supposedly highly trained on how to safely and effectively use de-escalation techniques so that mentally ill suspects can be safely approached and helped.

15.     Defendant TRISTIAN WAGNER #4188 ("WAGNER") is and at all times was a resident of the State of Michigan, employed as a sworn police officer by Defendant CITY OF DETROIT, acting in the course and scope of his employment, who is being sued in his individual capacity.

16.     Defendant MAX J. ZAHRINGER #5134 ("ZAHRINGER") is and at all times was, a resident of the State of Michigan, employed as a sworn police officer by Defendant CITY OF DETROIT, acting in the course and scope of his employment, who is being sued in his individual capacity.

17.     Defendants WHITE, DAVIS, JONES, WADERLOW, WAGNER, and ZAHRINGER, at all times relevant to this action, were acting under the color of state law in their capacities as DPD police officers.

## FACTUAL ALLEGATIONS

18.     Plaintiff's Decedent PORTER E. BURKS, was an African American male, born and raised in the City of Detroit.  PORTER started manifesting symptoms of mental illness while in high school, after which he was diagnosed with the same mental illness which afflicted his grandparent, paranoid schizophrenia.

19.     While his friends and colleagues advanced through high school, PORTER enrolled into an extended inpatient mental health program to receive the treatment he desperately needed.

20.     PORTER's mental illness sometimes caused psychosis, where PORTER saw and heard things that were not there.   During one of his hospitalizations, PORTER thought there was a squirrel living inside of him.  His efforts to extricate the squirrel were of course to no avail.  This was not the life the adolescent PORTER had chosen for himself.

21.     When PORTER was getting regular, effective treatment, he was a regular person.  He enjoyed dancing and listening to music like most 20-year-olds.

When receiving effective treatment, PORTER was a regular son, brother, and grandchild, and his family enjoyed being around and spending time with him.

22.     When his illness acted up, PORTER often became paranoid and many times felt threatened, especially if seeing or hearing things that were not there.  When these flare ups occurred, PORTER was taken to the hospital by either family or the police, where his medications were adjusted and re-administered.

23.     During one of his illness exacerbations, PORTER became involved in an incident with his siblings.  Though the incident was concerning, PORTER's siblings were never seriously injured, and PORTER was taken to the hospital immediately thereafter.  This was a personal and sensitive matter which the family decided to handle by getting appropriate mental health treatment for PORTER.

24.     During his good days, PORTER and his family were optimistic that once the proper medication and dosage regimen was established, PORTER would be able to live a consistent, functional, and regular life.

25.     In the spring of 2022, Defendant CITY OF DETROIT and Defendant WHITE identified 128 DPD police officers which it considered to be "high risk" (high risk for unlawful conduct).  Defendants WADERLOW and ZARINGER on this list.

26.     On Saturday, October 1, 2022, at approximately 6:00 pm, PORTER arrived at the family residence with a pocketknife on him.  PORTER's mother, Plaintiff, told him he could not come into the home with a pocketknife.

27.     Plaintiff and Plaintiff's son (PORTER's brother), tried to get PORTER to hand over the pocketknife.  When PORTER said he needed to hold onto the knife, Porter's brother called 911 at approximately 6:36 pm, to request that PORTER be taken to the hospital because he was a schizophrenic with bipolar disorder who has not been taking his medicine, and who was standing in the middle of the street with a pocketknife.  The brother explained that PORTER does not understand some things because of his schizophrenia.

28.     This request was not unusual in that the DPD were familiar with PORTER and previously assisted PORTER by taking him to the hospital on prior occasions when he was having a mental health flare up.

29.     A short while later (early evening 10-01-22), several DPD Officers arrived at the family residence and spoke to PORTER's sister, who reported that PORTER has schizophrenia and walked up the street while holding a pocketknife. The sister made it clear that PORTER did not do anything with the knife, and did not threaten her or anyone else with the knife.  The officers advised they will check around the neighborhood.

30.    On Sunday morning, October 2, 2022, at 4:13 am, PORTER's brother called 911 to remind them that his brother PORTER has schizophrenia, is going through an episode, and is walking around the neighborhood with a pocketknife.

31.    That same morning at 4:58 am, PORTER's brother again called 911 to report that his schizophrenic brother was walking around in the area with a pocketknife.

32.    Several minutes later, several DPD officers, including, upon information and belief, Defendants DAVIS, JONES, WADERLOW, WAGNER, and/or ZAHRINGER, arrived at PORTER's family residence where the spoke to PORTER's brother who advised the Officers that PORTER was mentally ill, weighed no more than 160 pounds, was on the next block over, in the middle of a mental illness episode, and possessed a pocketknife.

33.    The Defendant Officers advised the brother that they would find PORTER and take him to the hospital, where the brother would meet them so PORTER could receive mental health care and be petitioned.

34.    Defendant Officers left the family residence and started searching for PORTER.

35.    Minutes later, Officers / Defendants found PORTER walking northbound on Snowden Street (coming from Lyndon Street), located just a block away from PORTER's family residence.

36.     PORTER was holding in his hand a foldable pocketknife with a blade no longer than three inches.  PORTER was not violating any law by possessing this knife.   PORTER had not threatened anyone with the knife, and he was not threatening anyone when he was located by the Officers.

37.     A large group of officers, including Defendants DAVIS, JONES, WADERLOW, WAGNER, and ZAHRINGER, and other DPD officers, including Officer River Grishabar #3921, Officer Armando Hernandez #3559, Officer Malcolm Johnson #1892, Officer Lorenzo Palmer #3984, and Officer Symanns #4195, suddenly conveyed upon PORTER.

38.     Defendant WADERLOW, while standing in the middle of the street with Defendants and the other DPD Officers flanked to his left and to his right, yelled out to PORTER "we're here to help you", "you want a ride home", and "drop the knife".

39.     PORTER appeared to be confused when he was approached by the large group of DPD Officers, including Defendants, all of whom had their firearms drawn and pointed at PORTER.

40.     Defendant DEDELUK, the Shift Commander, arrived on the scene a few seconds later and instructed the Individual Defendants not to approach PORTER and to "back off". Defendant DEDELUK advised they needed to get a car in between PORTER and the officers.

41.    Defendant DEDELUK repeated this instruction, and specifically included Defendant WADERLOW "Hey, are you listening to me? Back off! Waderlow! Back. Off!".

42.    Defendants did not back off from PORTER as instructed by their supervising Sergeant, Defendant DEDELUK.  Instead, Defendants and the above referenced officers continued to face PORTER in the middle of Snowden Street, with firearms drawn.

43.    Disregarding his own instruction, Defendant DEDELUK, while smoking a cigarette, exited his patrol vehicle and walked toward PORTER with firearm drawn.  Standing alongside the other officers in the middle of the road, Defendant DEDELUK started talking to PORTER.

44.    Defendant DEDELUK and Defendant WADERLOW were now both trying to engage in conversation with, and give commands to, the mentally ill PORTER.

45.    Defendant DEDELUK asked PORTER, "Porter, do you wanna go get some help? Why don't you just drop the knife and we'll get you some help?"

46.    Defendant DEDELUK then walked to his left across the street, until he reached the residential sidewalk on the left side of the road, while facing PORTER.

47.     Defendant DEDELUK again asked PORTER if he could put the knife down, to which PORTER replied, "no".  DEDELUK asked him why, and PORTER responded "I just wanna hold the knife".

48.     Ten officers faced PORTER with the firearms drawn, who were lined up across the road, from the sidewalk on the right side, to the sidewalk on the left side of the road.

49.     Defendant DEDELUK promised PORTER that the Officers will put their weapons down – "I promise. Here, we'll put everything away".

50.     PORTER then told Defendant DEDELUK and the Officers that he wanted to go get some rest, to which DEDELUK responded "you want a ride home? We'll go take you home."

51.     PORTER again replied "I just wanna go get some rest".

52.     At the moment PORTER took a step forward with his hands raised above his hand (but not in a threatening manner) – and at least fifty (50) feet away from Defendant Officers, the Defendants opened fire and shot PORTER at least **thirty-eight (38) times**.

53.     DPD Records indicate that five different DPD officers discharged their firearms at PORTER, to-wit:

   a.  Defendant DAVIS fired eleven (11) rounds.
   b.  Defendant JONES fired two (2) rounds.
   c.  Defendant WADERLOW fired nine (9) rounds.
   d.  Defendant WAGNER fired three (3) rounds.

    e.   Defendant ZAHRINGER fired thirteen (13) rounds.

    f.   Defendant PLAMER fired his taser at close range.

54.    PORTER was shot at while holding his hands above his head, in a non-threatening manner.

55.    After Defendant Officers shot at Porter 38 times, Defendant WADERLOW (who shot at PORTER nine times) shouted out "Nice job! Nice job!".

56.    At the time Defendants recklessly unloaded 38 rounds of bullets directly at PORTER, Defendants neither objectively nor subjectively feared for their lives, nor should they have so feared, for reason PORTER never threatened the lives of any of the Officers at the time of Defendants' excessive and reckless discharge of fatal force.

57.    PORTER suffered 19 gunshot wounds, including a gunshot wound through the top of his head, six gunshot wounds to the chest, one gunshot wound to the abdomen, one gunshot wound to the right arm, one gunshot wound to the left arm, three gunshot wounds to the right leg, and one gunshot wound to the left leg.

58.    The gunshot wound through the top of the head tracked from left to right and *sharply downward.*

59.    As PORTER's defenseless, non-threatening, bullet ridden body laid on top of the blood-soaked concrete, Defendant WADERLOW instructed the officers to handcuff PORTER's wrists behind his back.

60.     Defendants JONES and ZAHRINGER handcuffed PORTER in the presence of other officers, including the Defendant Officers.

61.     A minute and a half after the shooting, Defendant ZAHRINGER felt PORTER's heart beating.

62.     Between 30 and 60 seconds after handcuffing PORTER, Defendant WADERLOW announced that PORTER was not breathing and instructed officers to begin CPR.

63.     Because there were no medic units available, Defendants WADERLOW, WAGNER, and SYMANNS placed the handcuffed and fatally bleeding PORTER into the back seat of scout car 2-1, to transport PORTER to Sinai-Grace Hospital.

64.     Defendant WADERLOW drove scout car 2-1 to the hospital while Defendants WAGNER and SYMANNS attempted CPR on the handcuffed and bleeding PORTER in the back seat.

65.     PORTER arrived at Sinai-Grace Hospital at 5:20 am (October 2, 2022), at which time Defendant WADERLOW and two other officers dragged PORTER into the ER and threw his lifeless body onto a gurney, with PORTER's arms still handcuffed behind his back.

66.     As he walked away from PORTER's room, Defendant WADERLOW announced to the ER he just brought in a multiple gunshot trauma.

67.     As the Sinai-Grace Emergency Medical team rushed to respond to PORTER, the ER nurse directed WADERLOW to remove the handcuffs so they could provide care to PORTER.  WADERLOW obliged.  However, it was too late to save PORTER and he was pronounced dead at 5:20 am, the time of his arrival to the ER.

68.     Incredibly, though he was shot multiple times, PORTER suffered no neck / spinal fractures and no heart trauma.

69.     PORTER died from multiple gunshot wounds, specifically from extensive bleeding in the lung area and from brain swelling.  PORTER did not die instantly, and tragically, PORTER suffered significant conscious pain and suffering between the moment he was shot and the time he ultimately died from his wounds.

70.     When PORTER's family members arrived at the hospital a short while later, only a young DPD officer stayed back at the hospital.  When asked by family what happened and who shot up their son, the young officer mumbled "I don't know".

71.     Not until the family later contacted DPD Headquarters did the DPD finally confide to the family that it was DPD officers who executed their son.

72.     The DPD's killing of PORTER BURKS has brought significant pain upon PORTER's family.

73.     While admitting it did not conduct anything close to a complete and thorough investigation, DPD policy makers decided that "transparency" compelled it to immediately clear their officers of any wrongdoing by unveiling only those items of evidence which fit their narrative and defense, as evidenced by the following:

    a.  Holding press conferences and playing edited excerpts from only two bodycam videos;

    b.  Never inviting PORTER's family to the press conferences;

    c.  Broadcasting to the entire world personal and confidential medical and family matters involving Decedent, which caused great embarrassment to the family, and which had nothing to do with Defendants' reckless shooting;

    d.  Representing that Decedent was tased first with no effect prior to being shot 38 times, while later acknowledging Decedent was too far away to be tazed;

    e.  Representing Decedent was only six feet away from officers when he was shot and killed, when the video clearly shows the distance to be at least fifty (50) feet;

    f.  Blaming others for Decedent's death instead of acknowledging that it was "highly trained" DPD Officers who needlessly shot a mentally ill man 38 times;

74.     All Defendants used objectively unreasonable excessive force under the circumstances.

75.     All Defendants rapidly, recklessly and needlessly elevated through the force continuum, culminating with deadly force being used by Defendants, when they created the situation for allegedly requiring the use of deadly force.

76.     Upon information and belief, Defendant DEDELUK was the shift commander and/or supervisor for the DPD on the date of the incident.

77.     In addition to failing to supervise and monitor his subordinate Defendant officers during the incident and prevent the excessive use of force that resulted in the death of PORTER, Defendant DEDELUK was also responsible for the initial investigation and securing the scene after the shooting.

78.     Defendant DEDELUK took the initial verbal statements from the involved officers, which he did with the cautionary instruction of "I don't want too many details" and "I don't want to know nothing else".

79.     The acts of the individual officers on the scene were intentional, malicious, reckless, grossly negligent, and undertaken with deliberate indifference to and callous disregard for Blaisdell's health and wellbeing, entitling his estate to punitive damages.

80.     The acts of the individual officers on the scene were undertaken in conformity with the customs, policies and practices of the Defendant City's police department and administration, subjecting Defendant City to municipal liability for

failure to properly hire, train, supervise, monitor, staff and/or discipline the officers in the Department.

81.    The acts and omissions, *inter alia*, of the individual officers and the supervisory staff, including Defendants DEDELUK and WHITE, leading to municipal liability are as follows:

a. Failing to train officers on how to deal with mentally distressed or mentally ill individuals by concentrating on defusing the situation without the use or threat of violence.

b. Claiming to have an alleged training program on how to deal with mentally distressed or mentally ill individuals by concentrating on defusing the situation without the use or threat of violence, when the Defendant actually had a *de facto* policy of a disparate impact against the mentally ill as evidenced by prior similar instances involving mentally ill individuals subjected to excessive and/or deadly force, deliberate indifference to their serious medical needs, denial of reasonable public services such as police services, and denial of mental health and medical care.

c. Failing to train its officers to not use excessive and/or deadly force on mentally ill persons who did not present risk of serious imminent harm;

d. Failing to train its officers on how to establish a chain of command and a stable line of authority when approaching a mentally ill person having a mental health crisis / episode;

e. Failing to train its officers on how to safely approach and de-escalate situations involving a mentally ill person having a mental health crisis / episode, thereby creating a de facto policy of disparate impact against the mentally ill as evidenced by prior similar instances involving mentally ill individuals subjected to excessive and/or deadly force, deliberate indifference to their serious medical needs, denial of reasonable public services such as police services, and denial of mental health and medical care.

f.  Representing to the public and citizens of the City of Detroit that the DPD was trained on, familiar with, and knew how to safely interact with mentally ill persons going through a mental health episode / crisis, when in fact the City of Detroit had a *de facto* policy of not safely interacting with and of using excessive force against mentally ill persons going through a mental health crisis / episode, and denying services and care to said mentally ill individuals.

g.  Failure to train its officers to refrain from the use of deadly force in a multiple officer situation with a mentally distressed or mentally ill person, where the officers face no risk of immediate harm, could de-escalate, use less than lethal force if necessary, and/or retreat.

h.  Ratifying, condoning, covering up, and/or rewarding all of the acts and failures to act by the individual and supervisory officers in the death of PORTER on October 2, 2022, claiming that Defendant Officers feared for their lives when in fact they did not so fear and discharged their firearms and/or other weapons intentionally and/or recklessly, and/or discharged their firearms and/or other weapons when any alleged threat posed by PORTER had been removed and no longer existed.

i.  Failing to train its officers on the use of force continuum and on the principle that the elevation of the continuum must proceed on a careful and staged basis, with the use of force by the officers never more than one level of force above that demonstrated by the citizen who is the object of the police action.

j.  Any other custom, policy or practice that becomes known through discovery.

82.   These acts and failures to act pursuant to the customs, policies and practices of the Defendant CITY OF DETROIT, its administration, DPD, and its individual officers, directly led to the use of excessive force against PORTER in violation of his Fourth and Fourteenth Amendment rights to be free from

unreasonable seizure, giving rise to municipal liability which is not subject to qualified immunity.

83.    As a direct and proximate result of Defendants' actions as described above and below, Plaintiff's Decedent and the heirs-at-law of Plaintiff's Decedent's Estate have suffered injuries and damages including but not limited to:

    a. Wrongful death.
    b. Conscious pain and suffering.
    c. Mental anguish, emotional distress, fright, shock, humiliation, and mortification.

    d. Loss of Decedent's society and companionship.
    e. Loss of Decedent's earning capacity.
    f. Funeral and burial expenses.
    g. Exemplary damages.
    h. Costs of litigation and attorney fees.
    i. Attorneys' fees and costs pursuant to 42 U.S.C. §1988.
    j. All other damages allowed under the Michigan Wrongful Death Act.
    k. Punitive damages

    l. All other damages allowed under §1983, §1988, and federal caselaw interpreting same.

## COUNT I

## 42 USC §1983 – VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS, EXCESSIVE FORCE

## (INDIVIDUAL DEFENDANT OFFICERS DAVIS, DEDELUK, JONES, PALMER, SYMANNS, WADERLOW, WAGNER, & ZAHRINGER)

84.     Plaintiff incorporates by reference each of the allegations contained in the previous paragraphs as though fully stated herein.  hereby restates and realleges the paragraphs above as if fully set forth herein.

85.     At all times relevant, PORTER had a clearly established right to liberty protected in the substantive components of the Due Process Clause of the Fourteenth Amendment to the United States Constitution, including his right to personal safety and bodily integrity, as well as protection from unlawful search, unlawful seizure, unnecessary force, unreasonable force and excessive force pursuant to the Fourth Amendment to the United States Constitution.

86.     At all times relevant, Defendants DAVIS, DEDELUK, JONES, PALMER, SYMANNS, WADERLOW, WAGNER, and ZAHRINGER, ("Defendant Officers") were police officers acting under color of law, and their acts and/or omissions were conducted within the scope of his / her / their official duties and employment, who were required to obey the laws of the United States including those laws identified under the Fourth and Fourteenth Amendments to the United States Constitution.

87.     That the Defendant Officers had knowledge of each and every factual allegation set forth above.

88.     In violation of PORTER's clearly established constitutionally protected right to be free from excessive force, punishment and deprivation of life and liberty

without due process of law under the Fourth and Fourteenth Amendments to the to the United States Constitution, Defendant Officers subjected PORTER to an unreasonable seizure, arrest, detention, excessive force; thereby inflicting horrendous personal injuries upon PORTER, including death.

89.   Under all the circumstances known to Defendant DPD Officers, the use of fatal force used against PORTER BURKS was objectively unreasonable and clearly excessive when Defendant DPD Officers discharged 38 bullets toward Decedent's person, without justification and without reasonably fearing imminent serious harm.

90.   Under all the circumstances known to Defendant DPD Officers, applying handcuffs to restrain PORTER BURKS by securing his arms behind his back, when he presented no risk of harm to anyone and who required life-saving medical treatment, was objectively unreasonable and clearly excessive, without justification and without reasonably fearing imminent serious harm.

91.   In violation of PORTER's clearly established constitutionally protected right to be free from excessive force, punishment and deprivation of life and liberty without due process of law under the Fourth and Fourteenth Amendments to the to the United States Constitution, Defendant Officers failed to act to prevent an unreasonable seizure, arrest and the use of excessive force against PORTER.

92.     At all times relevant, PORTER did not pose a threat to the safety of the Defendant Officers.

93.     Pursuant to 42 U.S.C. §§ 1983 and 1988, Defendant Officers are liable to Plaintiff's Decedent and to the heirs-at-law of Decedent's Estate, for all injuries and damages permitted under federal and state law.  To the extent that the damages allowable and/or recoverable under one or both statutes are deemed insufficient to fully compensate Plaintiff and/or to punish or deter the Defendants, this Court must order additional damages to be allowed to satisfy any and all such in adequacies.

94.     The conduct of Defendant Officers was and remains extreme and outrageous subjecting them to punitive damages.

95.     As a direct and proximate result of Defendant Officers' violations of PORTER's constitutionally protected rights, Plaintiff's Decedent and the heirs-at-law of Decedent's Estate suffered the injuries and damages as set forth and delineated above.

WHEREFORE, Plaintiff respectfully requests this Honorable Court enter a judgment in her favor and against Defendants and award compensatory and punitive damages in whatever amount the jury may determine, plus costs, interest, and actual attorney fees.

## COUNT II

### 42 U.S.C. § 1983 – MONELL LIABILITY
### DELIBERATE INDIFFERENCE TO UNCONSTITUTIONAL CUSTOMS, POLICIES, AND PRACTICES, BY SYSTEMATIC FAILURE TO HIRE, TRAIN, SUPERVISE, MONITOR, INVESTIGATE, REPORT, AND DISCIPLINE OFFICERS IN VIOLATION OF THE FOURTH AND FOURTENTH AMENDMENTS

### (DEFENDANTS CITY OF DETROIT, DEDELUK & WHITE)

96.     Plaintiff incorporates by reference each of the allegations contained in the previous paragraphs as though fully stated herein.  hereby restates and realleges the paragraphs above as if fully set forth herein.

97.     42 USC §1983 states:

> Every person, who under the color of any statute, ordinance, regulation, custom, or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

98.     Defendants CITY OF DETROIT, DEDELUK, and WHITE, the final policy makers and/or supervisors, had an obligation to hire, train, supervise, and monitor, its agents and employees, including the individual Defendants named herein, to ensure that the constitutional rights of PORTER and similarly situated citizens were not violated.

99.     Defendants CITY OF DETROIT, DEDELUK, and WHITE, had an obligation to investigate, report, and discipline its officers for the use of excessive force, other constitutional violations, violations of federal law, and violations of state law, including the individual Defendant Officers named herein, to ensure that the constitutional rights of PORTER and similarly situated citizens were not violated.

100.     Defendant DEDELUK, the shift commander / supervisor, pursuant to Defendant CITY OF DETROIT's customs, policies, and practices regarding training (or lack thereof) for setting up a command stricture for mental health runs involving mentally ill persons having a mental health crisis / episode, failed to effectively communicate with Defendant Officers on the scene to ensure that a proper procedure and command structure were created and followed to ensure the reasonable and safe interaction with PORTER.

101.     With deliberate indifference to the rights of citizens to be free from excessive force by the police, Defendants CITY OF DETROIT, DEDELUK, and WHITE have ongoingly encouraged, tolerated, ratified and acquiesced to a dangerous environment of police brutality and excessive force as set forth and delineated in the paragraphs above.

102.     Defendant CITY OF DETROIT's customs, policies and practices were a moving force behind the constitutional violations which caused Plaintiff's Decedent's injuries and damages as set forth and enumerated above.

WHEREFORE, Plaintiff respectfully requests this Honorable Court enter a judgment in her favor and against Defendants and award compensatory and punitive damages in whatever amount the jury may determine, plus costs, interest, and actual attorney fees.

## COUNT III

## 42 U.S.C. §12101 – VIOLATION OF THE AMERICANS WITH DISABILITIES ACT OF 1990

## (DEFENDANTS CITY OF DETROIT & WHITE)

103.   Plaintiff incorporates by reference each of the allegations contained in the previous paragraphs as though fully stated herein.

104.   The Americans with Disabilities Act of 1990 ("ADA") requires public agencies to deliver their benefits (services, programs or activities) in a nondiscriminatory manner and to afford a reasonable accommodation to individuals who are disabled whether temporarily or permanently.

105.   To comply with the ADA, public agencies, including Defendant CITY OF DETROIT and DPD, must properly train their employees, including sworn police officers, who by the nature of their duties routinely come in contact with disabled individuals, such as PORTER.

106.   Defendants CITY OF DETROIT and WHITE failed to comply with and/or violated the ADA with respect to the delivery of police services, a public benefit, and as a result, PORTER was subjected to excessive force, including fatal force, assault and battery, and was killed.

107.   Proper police training required the recognition that mental illness could be responsible for an individual's behavior, rather than a criminal intent, mindset, or conduct.

108.   Proper training also required recognition that aggressive confrontational police tactics with mentally ill persons having a mental health episode / crisis are likely to cause harm and injury by confusing and agitating the mentally ill person which may cause him or her to unknowingly over respond.

109.   In order to comply with the ADA, Defendant should have properly trained its officers ton how to de-escalate and defuse such situations rather than presuming the mentally ill person in crisis is simply non-compliant who will respond to confrontation and escalation of force like a person without mental illness.

110.   The actions of the Defendant Officers in targeting PORTER because of his disability was discrimination pursuant to the ADA, giving rise to municipal liability.

111.   Before they acted in concert and undertook their quick moving and aggressive confrontation with PORTER, Defendant Officers knew that PORTER

was mentally ill with schizophrenia who had not been on his medication and who was having a mental health episode / crisis.

112.   Defendants' targeting treatment and failure to deescalate the situation in the face of their knowledge of PORTER's disability gives rise to liability under the ADA and binds Defendants CITY OF DETROIT and WHITE.

113.   As a direct and proximate result of Defendant' misconduct as described above, Plaintiff's Decedent and the heirs-at-law of Decedent's Estate suffered the injuries and damages as set forth and delineated above.

WHEREFORE, Plaintiff respectfully requests this Honorable Court enter a judgment in her favor and against Defendants and award compensatory and punitive damages in whatever amount the jury may determine, plus costs, interest, and actual attorney fees.

Respectfully submitted by:

/s/ Todd J. Weglarz
TODD J. WEGLARZ (P48035)
Fieger Law
Attorneys for Plaintiff
19390 W. 10 Mile Road
Southfield, MI  48075
(248) 355-5555
(248) 355-5148 (fax)
t.weglarz@fiegerlaw.com

Dated:  October 1, 2024