UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **QUIEAUNA WILSON, as Personal Representative of the Estate of PORTER E. BURKS, Deceased,**<br><br>Plaintiff,<br><br>**v.**<br><br>**CITY OF DETROIT, a Municipal Corporation, Police Chief JAMES WHITE, in his official capacity, and Officers COREY DAVIS #474, NICHOLAS DEDELUK #S-1271, BEVERLY A. JONES #2101, ZACHARY SYMANNS #4195, SEAMUS WADERLOW #4845, TRISTIAN WAGNER #4188, and MAX J. ZAHRINGER #5134, in their Official and Individual Capacities, Jointly and Severally**<br><br>Defendants. | **2:24-CV-12590-TGB-APP**<br><br>HON. TERRENCE G. BERG<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF No. 27)**<br><br>**AND DENYING AS MOOT DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY (ECF NO. 28)** |

This case is a civil rights lawsuit against the City of Detroit and several Detroit Police officers arising out of a shooting incident resulting in the death of Porter Burks.

Plaintiff Quiana Wilson, as personal representative of Mr. Porter Burks's estate, brought suit against the City of Detroit, Detroit Chief of Police James White, and several Detroit Police Department ("DPD") officers—Officer Corey Davis, Sergeant Nicholas Dedeluk, Officer

Beverly A. Jones, Officer Lorenzo Palmer, Officer Zachary Symanns, Officer Seamus Waderlow, Officer Tristian Wagner, and Officer Max J. Zahringer—asserting claims arising under 42 U.S.C. § 1983 and the American with Disabilities Act of 1990 (42 U.S.C. § 12101). Defendants have moved for summary judgment and to exclude testimony by Plaintiff's expert. ECF Nos. 27, 28. For the reasons stated below, Defendants' Motion for Summary Judgment is **GRANTED**, and their Motion to Exclude Testimony of Scott A. DeFoe is **DENIED AS MOOT**.

## I. BACKGROUND

### *A. Factual Background*

On October 2, 2022, Mr. Porter Burks was shot by a group of Detroit Police officers. ECF No. 27, PageID.223. The day before, his older brother called the Detroit Police Department requesting officers to help Mr. Burks, who was schizophrenic and potentially not taking his medicine, while armed with a knife. ECF No. 33-2, Ex. 1 (911 Call 1) at 0:32–0:56. Non-party officers responded to dispatch and spoke with Mr. Burks's sister about the situation, and she told the officers that Mr. Burks had schizophrenia and was walking down the street with a knife in his hand. ECF No. 33-2, Ex. 2 at 1:12–1:28. The next morning, Mr. Burks's brother again called the Detroit Police Department to request support because Mr. Burks was having a schizophrenic episode. ECF No. 33-2, Ex. 1 (911 Call 2) at 0:29-0:40.

After the call that morning, Officers Zahringer and Wagner responded to dispatch and spoke with Mr. Burks's older brother. ECF No. 33-2, Ex. 3 (Zahringer Cam Pre-Incident). He described to the officers that Mr. Burks was having a schizophrenic episode while walking around with a knife, and that he was concerned for people's safety. *Id.* at 2:04–2:20. When dispatch broadcast the run to the officers who were on shift, it indicated that the person of interest had some form of mental illness and was armed with a knife. ECF No. 33-3, PageID.1328. Eventually, all officers on shift arrived to respond to the run because "no other runs were pending." *Id.* at PageID.1329.

Officers Johnson and Grishaber found Mr. Burks on Snowden Street several minutes after the officers began searching for him. *Id.* When Sergeant Dedeluk arrived at Mr. Burks's location, Officer Waderlow was primarily responsible for communicating with Mr. Burks and was the closest physical officer to him. *Id.*; ECF No. 33-2, Ex. AA at 1:58–2:04 (Dedeluk Cam). For several minutes, both Sergeant Dedeluk and Officer Waderlow requested that Mr. Burks drop the knife, but he never complied. ECF No. 33-2, Ex. A-4 at 0:29–4:50 (Waderlow Cam). During that conversation, the officers told Mr. Burks that they could take him home and get him the help that he needed. *Id.* Still, by this point, several officers had their weapons drawn, though Sergeant Dedeluk did request that at least one officer deploy a taser instead. ECF No. 33-2, Ex. 12 (DPD MultiCam Synched); ECF No. 33-3, PageID.1331. When asked

why he refused to drop the knife, Mr. Burks responded that he "like[s] to hold a knife." ECF No. 33-16, PageID.1637.

Mr. Burks paced back and forth for most of this conversation, but never truly approached the officers until after Sergeant Dedeluk went back to his scout car. ECF No. 33-2 Ex. A-4 at 4:48–5:11 (Waderlow Cam); ECF No. 33-2, Ex. AA at 5:20–5:48 (Dedeluk Cam); ECF No. 33-3, PageID.1333. Towards the end of the conversation with the officers, before Sergeant Dedeluk entered his scout car, Mr. Burks expressed several times that he wanted to get some rest. ECF No. 33-2, Ex. AA at 5:07–5:15. He also briefly mentioned wanting to go to "DRH," which could have been a reference to Detroit Receiving Hospital, a place where he previously received treatment. ECF No. 33-16, PageID.1636; ECF No. 33-29, PageID.2034.

Moments after this conversation ended, Mr. Burks ran directly towards Officer Waderlow, while holding the knife above his head. ECF No. 33-2, Ex. A-4 at 4:48–5:11 (Waderlow Cam). Once he began running, Officers Waderlow, Davis, Jones, Wagner, and Zahringer fired multiple shots at Mr. Burks. ECF No. 33-2, Ex. 12 (DPD MultiCam Synched). After Mr. Burks fell to the ground from the shots fired, Officer Zahringer placed him in handcuffs. ECF No. 33-2, Ex. A-6 at 5:11–5:40 (Zahringer Cam). Seconds later, Officer Wagner began CPR, but he determined that it was best to transport Mr. Burks in a scout car on scene. ECF No. 33-2, Ex. 8 at 5:50–7:23. Officer Waderlow drove Mr. Burks along with his

fellow officers to the hospital. *Id.* at 7:24–10:15. He was pronounced dead shortly after arriving at Sinai Grace Hospital.

### *B. Procedural Background*

Plaintiff, as personal representative of Mr. Burks's estate, filed her Complaint on October 1, 2024. ECF No. 1. In it, she brings the following claims: (1) Violation of the Fourth and Fourteenth Amendments, under § 1983, for excessive force against Individual Defendant Officers Davis, Dedeluk, Jones, Palmer, Symanns, Waderlow, Wagner, & Zahringer ("Individual Defendants"); (2) *Monell* Liability, under § 1983, for deliberate indifference to unconstitutional customs, policies, and practices, by systemic failure to hire, train, supervise, monitor, investigate, report, and discipline Officers in violation of the Fourth and Fourteenth Amendments against Defendants City of Detroit, Dedeluk, and White ("Supervisory Defendants"); and (3) Violation of the Americans with Disabilities Act of 1990 against Defendants City of Detroit & White ("Municipal Defendants").

Defendants City of Detroit, Police Chief White, Sergeant Dedeluk, and Officer Wagner filed their Answer on December 10, 2024. ECF No. 3. Defendants Officers Waderlow and Jones filed their Answer on January 10, 2025. ECF No. 10. Defendants Officers Zahringer, Davis, and Symanns filed their Answer on February 10, 2025. ECF No. 13. Defendant Officer Palmer filed his Answer on February 13, 2025. ECF No. 15. All Defendants filed the pending Motion for Summary Judgment

and Motion to Exclude Expert Testimony on February 27, 2026. ECF No. 27; ECF No. 28. That motion is now fully briefed.

## II. STANDARD OF REVIEW

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact such that the movant is entitled to a judgment as a matter of law." *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013) (cleaned up); *see also* Fed. R. Civ. P. 56(a). A fact is material only if it might affect the outcome of the case under governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

On a motion for summary judgment, the Court must view the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted); *Redding v. St. Eward*, 241 F.3d 530, 531 (6th Cir. 2001).

The moving party has the initial burden of demonstrating an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party carries this burden, the party opposing the motion "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587. The trial court is not required to "search the entire record to establish that it is

bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989). Instead, the "nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001). The Court must then determine whether the evidence presents a sufficient factual disagreement to require submission of the challenged claims to the trier of fact or whether the moving party must prevail as a matter of law. *See Anderson*, 477 U.S. at 252. For the Court to grant summary judgment, the evidence cannot be such that "a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

## III. Discussion

### *A. Motion for Summary Judgment*

#### 1. <u>Excessive Force [Count I]</u>

The Individual Defendants argue that they are all entitled to qualified immunity from Plaintiff's excessive force claim in Count I of Plaintiff's Complaint. Viewing the factual evidence and reasonable inferences in the light most favorable to Plaintiff, the Court concludes that there is no genuine dispute of material fact, and the Individual Defendants are entitled to judgment as a matter of law.

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability

for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Thus, a defendant succeeds on their summary judgment claim unless the facts, viewed in the light most favorable to the plaintiff, "would permit a reasonable juror to find that (1) the defendant violated a constitutional right; and (2) the right was clearly established." *Bishop v. Hackel*, 636 F.3d 757, 765 (6th Cir. 2011) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). The plaintiff bears the burden of showing that all facts and reasonable inferences "would allow a reasonable juror to conclude that the defendant violated a clearly established constitutional right." *Williams v. Maurer*, 9 F.4th 416, 431 (6th Cir. 2021).

**a. Constitutional Violation**

"The Fourth Amendment's prohibition against unreasonable seizures protects citizens from excessive use of force by law enforcement officers." *Godawa v. Byrd*, 798 F.3d 457, 463 (6th Cir. 2015); *see also Tennessee v. Garner*, 471 U.S. 1, 7 (1985) (observing that "apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment"). In the Sixth Circuit, courts employ "an objective reasonableness test, looking to the reasonableness of the force in light of the totality of the circumstances confronting the defendants." *Brown v. Lewis*, 779 F.3d 401, 418 (6th Cir. 2015) (quoting *Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir. 2013)).

The "objective reasonableness" test focuses on what a reasonable officer under the circumstances would have done, rather than determining a specific officer's subjective thoughts or what that officer could have done "with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396–97 (1989). During a traditional law enforcement emergency, where an officer is responding to an alleged crime, courts consider: (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. However, when an officer is responding to a medical emergency, a "more tailored set of factors" applies. *Hill v. Miracle*, 853 F.3d 306, 314 (6th Cir. 2017). Instead, the relevant questions are:

> (1) Was the person experiencing a medical emergency that rendered him incapable of making a rational decision under circumstances that posed an immediate threat of serious harm to himself or others?
>
> (2) Was some degree of force reasonably necessary to ameliorate the immediate threat?
>
> (3) Was the force used more than reasonably necessary under the circumstances (i.e., was it excessive)?
>
> If the answers to the first two questions are "yes," and the answer to the third question is "no," then the officer is entitled to qualified immunity.

*Id.*

Plaintiff argues that Mr. Burks had not committed a crime, while the Individual Defendants correctly highlight that his brother reported

to officers that Mr. Burks slashed his tires. ECF No. 33-2, Ex. 3 at 3:30–3:38 (Zahringer Cam Pre-Incident); ECF No. 34, PageID.2087. Even so, when the Individual Defendants were dispatched, Mr. Burks was not the suspect of a crime. ECF No. 27, PageID.530. And at least from the perspective of some of the Individual Defendants, they believed their role was "to assist a person in a mental health crisis." *Id.* While the Court will apply the factors outlined in *Hill* for responses to medical emergencies rather than traditional law enforcement emergencies, the analysis is functionally the same. The key inquiry is whether the individual was an immediate threat to the safety of others and whether the officers used reasonable force to respond to that threat.

Applying the *Hill* factors, the Court finds, based on the facts as viewed in the light most favorable to Plaintiff, no reasonable juror could conclude that the Individual Defendants used excessive force. First, Plaintiff was experiencing a medical emergency and was incapable of making a rational decision due to his schizophrenic episode. *See* ECF No. 33, PageID.1284 ("Porter was still having a schizophrenic episode . . . ."). Plaintiff's brother informed several of the Individual Defendants that he was "having an 'episode,'" and they understood he "was in the midst of mental crisis." *Id.* at PageID.1285; *see also* ECF No. 33-4, PageID.1373 ("I just remembered he was in mental crisis.").

Plaintiff argues that Mr. Burks was not an immediate threat of serious harm to himself or others. But the facts present a different

picture. During the incident, Mr. Burks wielded a knife, which the Individual Officers on several occasions ordered him to drop, so they could render service. ECF No. 33-2, Ex. A-4 at 0:29–4:50 (Waderlow Cam). But Mr. Burks refused the Individual Defendants' repeated requests to drop his weapon. *Id.* No Individual Defendant fired any shots until Mr. Burks began running full-speed toward the Individual Defendants while still holding the knife. ECF No. 33-2, Ex. A-6 at 5:04–5:07 (Zahringer Cam). Plaintiff argues that Mr. Burks's actions in running towards them with his hands above his head should have been seen as a sign of surrender. ECF No. 33, PageID.1289. But viewing the multiple body cam videos from several officers, no reasonable person could interpret Mr. Burks' conduct in running directly at the officers with a knife as an attempt to surrender. Shortly after Sergeant Dedeluk offered him a ride home, Mr. Burks suddenly ran toward the officers, waving the knife over his head. ECF No. 33-17, PageID.1697; ECF No. 33-2, Ex. A-6 at 4:30–5:07 (Zahringer Cam); ECF No. 33-2, Ex. 5 at 4:40–5:15 (Waderlow Cam); ECF No. 33-2, Ex. 8 at 4:30–5:09 (Wagner Cam); ECF No. 33-2, Ex. 7 at 9:05–9:40 (Davis Cam); ECF No. 33-2, Ex. 9 at 3:00–3:29 (Jones Cam). Additionally, the Detroit Police Department estimated that Mr. Burks was 40 feet away from the Individual Defendants when shooting began. ECF No. 33-2, Ex. 13 (DPD Video Presentation Comp Measurements).

Holding the knife alone would not justify the Individual Defendants in shooting Mr. Burks. *Campbell v. Cheatham Cnty. Sheriff's Dep't*, 47 F.4th 468, 480 (6th Cir. 2022) ("[M]ere possession of a weapon is not sufficient to justify the use of deadly force."). However, his running towards them while holding the knife after repeated orders to drop it leaves no genuine dispute of material fact that Mr. Burks presented an immediate threat to the safety of the officers. While Plaintiff implies that 40 feet of clearance suggests that there was no risk, the Court concludes that, viewing the evidence in the light most favorable to the non-moving party, no reasonable juror could conclude that an armed individual running towards the officers, even starting from 40 feet away, would not constitute an immediate threat of serious harm.

Plaintiff argues in response that even if some force was necessary, the Individual Defendants used *more* force than was reasonably necessary under the circumstances. While Mr. Burks's conduct presented risks, he made no verbal threats towards any of the officers and communicated on several occasions that he wanted to get rest, and potentially wanted to be treated at Detroit Receiving Hospital. ECF No. 33-2, Ex. A-4 at 0:29–4:50 (Waderlow Cam); *see also Studdard v. Shelby Cnty., Tennessee*, 934 F.3d 478, 481 (6th Cir. 2019) (stating that a lack of verbal threats by an individual weighs against the use of lethal force). Sergeant Dedeluk even made some reference to at least one officer that they should use their taser during the encounter. ECF No. 33-3,

PageID.1331. Still, most of the officers drew their firearms during the encounter. ECF No. 33-2, Ex. 12 (DPD MultiCam Synched).

Here, in contending that less lethal force could have been used, Plaintiff argues that the officers knew that Mr. Burks suffered from schizophrenia; he never made any verbal threats towards the officers or any bystanders; his raised hands could be interpreted as surrender; the police department has a policy of using "less lethal prior to using deadly force"; and at least one of these officers had safely de-escalated a situation involving a mentally ill individual wielding a knife in the past. *See* ECF No. 33-3, PageID.1325 (detailing Sergeant Dedeluk's experience dealing with a similar incident). Taken together, Plaintiff argues the officers had the means and proper incentives to use less than lethal force, yet they failed to do so against Mr. Burks.

While these points are relevant and reasonable, the Sixth Circuit has previously foreclosed the key elements of this line of argument. In *Chappell v. City of Cleveland*, 585 F.3d 901 (6th Cir. 2009), the Sixth Circuit considered a similar factual situation. There, officers shot a decedent within a bedroom who quickly approached them, wielding a knife raised above his head. *Id.* at 911. The district court explained that "the blade was pointed upward" and "not in a position to immediately threaten them," much like Mr. Burks was here. *Id.* But the Sixth Circuit in *Chappell* discourages speculation by this Court about possible meanings of a suspect's movements: "[T]he district court's musing about

the significance of the knife's position in McCloud's hand, speculation at odds with both officers' on-the-scene perceptions, represents exactly the sort of theoretical speculation that the courts are prohibited from engaging in." *Id.* at 912. The Court observes that the officers here were not in as close quarters with Mr. Burks and likely had more time to react than the officers in *Chappell* did. But neither party addressed such arguments, and the undisputed evidence highlights that Mr. Burks ran towards the officers while holding a knife. Based on this circuit's precedent, the manner in which Mr. Burks positioned the knife does not create a genuine issue of fact as to his having presented a serious risk of harm.

Plaintiff's key remaining argument is the fact that the Individual Defendants failed to seriously consider the use of less-than-lethal force despite their policy and awareness of Mr. Burks's mental condition. Officers are required to take into account an individual's diminished capacity before using force to restrain them, even if they pose an imminent threat. *See Roell v. Hamilton Cnty., Ohio*, 870 F.3d 471, 481–82 (6th Cir. 2017). Several officers drew their weapons well before Mr. Burks ever began running. ECF No. 33-2, Ex. 11 at 4:00–5:51 (Johnson Cam). At this point and well before, the Individual Defendants could have discussed alternatives to lethal force rather than multiple officers resorting to guns.

But these arguments have likewise been addressed by the Sixth Circuit, and do not prevail. Excessive force claims must be evaluated at the moment immediately before an officer used allegedly excessive force. *Reich v. City of Elizabethtown, Kentucky*, 945 F.3d 968, 978 (6th Cir. 2019). "Poor planning or bad tactics that might have 'created the circumstances' that led to the use of force" are immaterial. *Id.* (quoting *Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 406 (6th Cir. 2007)). Consequently, the only relevant facts involve the moments leading up to and during the use of force, which this Court has already addressed. The officers' less-than-ideal planning in using their firearms instead of tasers cannot assist Plaintiff in defeating this motion for summary judgment.

Since none of Plaintiff's arguments overcome the undisputed evidence showing the existence of a serious threat to safety, the Court concludes that no reasonable juror could find that Mr. Burks's constitutional rights were violated, so Plaintiff cannot establish the first prong necessary to overcome qualified immunity.

**b. Clearly Established Right**

Even if a reasonable juror could agree with Plaintiff that several of the Individual Defendants violated Mr. Burks's constitutional rights, on the record before the Court, Plaintiff has not shown that those rights were clearly established. A right is only "clearly established" if the law is "sufficiently clear" such that "every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *District of*

*Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (citation omitted). That rule cannot be defined at "a high level of generality," especially in Fourth Amendment cases, "where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)). Accordingly, in excessive force cases, officers are entitled to qualified immunity "unless existing precedent 'squarely governs' the specific facts at issue." *Id.* (quoting *Mullenix*, 577 U.S. at 13).

Plaintiff points to *Studdard v. Shelby Cnty., Tennessee*, 934 F.3d 478, 481 (6th Cir. 2019), cited above, in support of her position that the right was clearly established. The Court disagrees. The Sixth Circuit's ruling in *Studdard* does not squarely govern the facts at issue in this case. *Studdard* involved an individual who, while similarly far away, slit his own wrists and raised his knife to his throat. *Studdard*, 934 F.3d at 481. Rather than charging towards the officers, he moved towards them in a "swaying motion." *Id.* While Plaintiff rightly highlights that Mr. Studdard was similarly out of reach of anyone, made no verbal threats, and also refused to drop his weapon, that case presented materially less danger. "There is a world of difference between a knife-wielding suspect who runs at officers and one who doesn't." *Id.* at 483. Thus, Plaintiff has failed to show that under the circumstances presented here Mr. Burks had a clearly established right that was violated.

Because Plaintiff failed to meet either prong of the qualified immunity test, the Individual Defendants' motion for summary judgment on Count I is **GRANTED**.

### 2. *Monell* & Supervisory Liability [Count II]

The City of Detroit, Chief White, and Sergeant Dedeluk ("Supervisory Defendants") argue that neither municipal nor supervisory liability attaches in this case. The Court finds that no genuine dispute of material fact exists on either contention. "If a person has suffered no constitutional injury at the hands of [an individual officer], the fact that departmental regulations might have authorized [unconstitutional conduct to occur] is quite beside the point." *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986); *see also Wilson v. Morgan*, 477 F.3d 326, 340 (6th Cir. 2007) ("There can be no *Monell* municipal liability under § 1983 unless there is an underlying unconstitutional act."). Similarly, there can be no supervisor liability without an underlying constitutional violation. *McQueen v. Beecher Cmty. Schs.*, 433 F.3d 460, 470 (6th Cir. 2006) ("[A] prerequisite of supervisory liability under § 1983 is unconstitutional conduct . . . ."). Because no reasonable juror could find that Mr. Burks's constitutional rights were violated, Plaintiff has failed to raise a genuine issue of fact as to *Monell* or supervisory liability. Accordingly, the Court **GRANTS** the Supervisory Defendants' motion for summary judgment on Count II.

**3. <u>ADA Claim [Count III]</u>**

The City of Detroit and Chief White ("Municipal Defendants") argue that Plaintiff is not entitled to any relief under Title II of the Americans with Disabilities Act ("ADA"). The Court agrees. Title II of the ADA permits claims for intentional discrimination and failure to provide reasonable accommodation. *Roell*, 870 F.3d at 488. Plaintiff's Complaint contains several sentences highlighting that the officers targeted Mr. Burks. ECF No. 1, ¶¶ 110–12. But her Response to the Motion for Summary Judgment focuses primarily on the Municipal Defendants' failure to provide Mr. Burks with reasonable accommodations when employing force against him. Since she has failed to present any evidence indicating that the Individual Defendants intentionally discriminated against Mr. Burks because of his disability, the Court will focus on the reasonable accommodations claim.

The Sixth Circuit has not decided whether Title II of the ADA applies to police officers when making arrests. *Roell*, 870 F.3d at 489. At times, the court has assumed Title II applied to arrests in order to discuss the type of reasonable accommodation that officers might be expected to provide. *Id.*; *Wilson v. Gregory*, 3 F.4th 844, 859–60 (6th Cir. 2021). "[A]n accommodation is not reasonable if it requires more than a 'moderate' change to existing policies." *Booth v. Lazzara*, 164 F.4th 581, 589 (6th Cir. 2026) (quoting *Doe by K.M. v. Knox Cnty. Bd. of Ed.*, 56 F.4th 1076, 1087 (6th Cir. 2023)). Generally, a municipality "need not adjust [its]

policies for detaining individuals if 'safety concerns' would arise from the change." *Booth*, 164 F.4th at 589 (quoting *Wilson*, 3 F.4th at 860).

Plaintiff argues that Individual Defendants should have leveraged a different approach when interacting with Mr. Burks. *See* ECF No. 33, PageID.1307. She supports that assertion by relying on Ninth Circuit precedent while neglecting the Sixth Circuit's. She distinguishes *Roell* based on when Mr. Burks made his arguably aggressive approach; Mr. Burks began running multiple minutes into the encounter with officers, but Mr. Roell approached immediately. That is a distinction without a difference. Regardless of when Mr. Burks initiated his sudden action, the circumstances were "tense, uncertain, and rapidly evolving." *Graham*, 490 U.S. at 397. The footage displays Mr. Burks pacing back and forth, refusing to place his knife on the ground, backing up in a manner that could have exposed more bystanders to risk, and ultimately running towards the officers. ECF No. 33-2, Ex. A-4 at 0:29–4:50 (Waderlow Cam). As Sergeant Dedeluk discussed in his deposition, his primary concern before entering his scout car was ensuring that Mr. Burks did not get away. ECF No. 33-3, PageID.1333. But the footage indicates that the situation changed rather quickly.

This case presented dangerous circumstances despite Mr. Burks's relatively contained movement that preceded his eventual run toward the officers. The officers attempted to negotiate with Mr. Burks before the confrontation and tried to use the passage of time as a means of

avoiding a deadly confrontation. But those tactics were not feasible once he rapidly began to run toward them. Requiring officers to continue negotiations or other de-escalation techniques as an accommodation in the face of such a threat would risk the kinds of safety concerns that the Sixth Circuit has cautioned against. *See Wilson*, 3 F.4th at 860 (citation omitted). In fact, the court of appeals has already stated that officers are "not required to accommodate [an individual's] disability when following their usual procedures for high-risk situations like this one." *Booth*, 164 F.4th at 590.

Further, Plaintiff's Response focuses primarily on the Individual Defendants' conduct rather than any objectionable policy by the Municipal Defendants. True, Plaintiff's Complaint highlights that the Municipal Defendants should have properly trained officers on de-escalation. ECF No. 1, PageID.27. But the bulk of her Response seems predicated on the Individual Defendants' supposed failure to "engage[] in non-threatening communications and use[] the passage of time to defuse the situation rather than precipitating a deadly confrontation." ECF No. 33, PageID.1307. Although not formally decided, the Sixth Circuit has held that the ADA does not permit vicarious liability theories. *See Booth*, 164 F.4th at 589. Thus, at its onset, Plaintiff's claim already stretched beyond the outer limits of the conduct which the ADA covers, leaving Defendants entitled to judgment as a matter of law.

Accordingly, the Court **GRANTS** the Municipal Defendants' motion for summary judgment on Count III.

## IV. CONCLUSION

For the reasons stated above, the Court **GRANTS** Defendants' Motion for Summary Judgment (ECF No. 27). Because judgment will be for Defendants, the question of the reliability of Plaintiff's expert testimony need not be addressed, so the Court **DENIES AS MOOT** Defendants' Motion to Exclude Mr. DeFoe's Testimony (ECF No. 28). Plaintiff's claims are **DISMISSED WITH PREJUDICE**, and this Order closes this case.

**SO ORDERED.**

Dated: September 22, 2026 s/Terrence G. Berg

HON. TERRENCE G. BERG
UNITED STATES DISTRICT JUDGE